**BALLARD SPAHR LLP**
A Pennsylvania Limited Liability Partnership
David A. Haworth, Esq.
Justin Lamson, Esq. (admitted *pro hac vice*)
Justin Kerner, Esq.
Erin M. Carter, Esq. (admitted *pro hac vice*)
700 East Gate Drive, Suite 330
Mount Laurel, NJ 08054
Telephone: (856) 761-3400
Facsimile: (856) 761-1020
haworthd@ballardspahr.com
lamsonjw@ballardspahr.com
kernerj@ballardspahr.com
cartere@ballardspahr.com

*Attorneys for E. I. du Pont de Nemours and Company (as to Third Count only in Civil Action Nos. 1:19 -14766 and 3:19 -14767, the ISRA claims); Corteva, Inc. (as to all claims except the fraudulent transfer claims); and DuPont de Nemours, Inc. (as to all claims except the fraudulent transfer claims)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al., | Civil Action No. 2:19-14758-JMV-JBC (Hon. John M. Vazquez, U.S.D.J.) |
| Plaintiffs, | |
| v. | Motion Date: December 20, 2021 |
| E. I. DU PONT DE NEMOURS AND COMPANY, et al., | ORAL ARGUMENT REQUESTED |
| Defendants. | |

## BRIEF IN SUPPORT OF DEFENDANTS E. I. DUPONT DE NEMOURS AND COMPANY CORTEVA, INC., AND DUPONT DE NEMOURS, INC.'S MOTION TO DISMISS, IN PART, COUNT III OF THE CHAMBERS WORKS SECOND AMENDED COMPLAINT

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ......................................................................... 1

II.   STATEMENT OF RELEVANT FACTUAL ALLEGATIONS ................... 5

III.  ARGUMENT............................................................................... 7

     A.    Standard of Review ............................................................ 7

     B.    The Court should dismiss Plaintiffs' ISRA claim, relating to the 2019 Reorganization, because that aspect of the claim is moot. ......... 8

     C.    The events of the 2019 Reorganization did not trigger the need to comply with ISRA because, as a matter of law, they fall under three separate statutory exclusions........................................... 11

     D.    Plaintiffs did not sufficiently plead that Corteva or New DuPont assumed EID's liability because Plaintiffs legal assertions are not supported by facts. ...................................................... 26

IV.  CONCLUSION........................................................................... 27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................7, 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................................7, 8

*Blanciak v. Allegheny Ludlum Corp.*,
   77 F.3d 690 (3d Cir. 1996) ..............................................................................9, 11

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ...............................................................................5

*Horner v. ELM Locating & Util. Servs.*,
   *No*. 13-cv-1168, 2014 U.S. Dist. LEXIS 174237 (C.D. Ill. Nov. 18,
   2014) ....................................................................................................................11

*Kost v. Kozakiewicz*,
   1 F.3d 176 (3d Cir. 1993) ......................................................................................7

*Love v. Alfacell Corp.*,
   Civil Action No. 09-5199 (MLC), 2011 U.S. Dist. LEXIS 119445
   (D.N.J. Oct. 17, 2011)............................................................................................5

*Mariotti v. Mariotti Bldg. Prods., Inc.*,
   714 F.3d 761 (3d Cir. 2013) ..................................................................................8

*Morse v. Lower Merion Sch. Dist.*,
   132 F.3d 902 (3d Cir. 1997) ..................................................................................8

*N.J. Dep't of Envtl. Prot. v. Ventron*,
   94 N.J. 473 (1983) ...............................................................................................26

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) ..................................................................................5

*Sierra Club v. U.S. EPA*,
   762 F.3d 971 (9th Cir. 2014) ...............................................................................16

**Statutes**

N.J.S.A. 1:1-1................................................................................................15

N.J.S.A. 13:1K-8.......................................................................................12, 24

New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 to -13.1.............*passim*

**Other Authorities**

Fed. R. Civ. P. 8(a)....................................................................................7, 8

Fed. R. Civ. P. 12(b)(6)..................................................................................7

N.J.A.C. 7:26B -1.4.........................................................................3, 4, 15, 24

N.J.A.C. 7:26B-2-2(a-f)..................................................................................4

N.J.A.C. 7:26B-2.1(a)(1) ..........................................................................12, 14

N.J.A.C. 7:26B-2.1(a)(2) ......................................................................12, 22, 23

N.J.A.C. 7:26B-2.1(a)(4) ......................................................................12, 24

N.J.A.C. 7:26B-2.2(b)..............................................................................24, 26

N.J.A.C. 7:26B2.2(a-f)..................................................................................19

N.J.A.C. 7:26C-5.1.........................................................................................9

N.J.A.C. 7:26C-5.8(b)..................................................................................18

U.S. Const. art. III, § 2..................................................................................9

I.    **INTRODUCTION**

In their Second Amended Complaint in this action,[1] regarding the Chambers

Works Site (the "SAC"), Plaintiffs assert that E.I. du Pont de Nemours and Company

("EID") violated the New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-6 to

-13.1 ("ISRA"). Specifically, they allege that corporate reorganizations occurred in

2015 and 2019, and that aspects of those transactions triggered EID's need to comply

with ISRA.[2]

In this motion, EID, Corteva, Inc. ("Corteva"), and New DuPont (together,

"Moving Defendants") seek dismissal of all ISRA allegations in the SAC related to

the 2019 corporate reorganization because: (1) the relief sought by Plaintiffs has

been satisfied, which leaves their claim moot; and (2) the facts of the 2019 corporate

reorganization fall under three well-known ISRA exclusions, meaning that

---

[1] Pursuant to the June 8, 2020 Consolidation Order (Dkt. 31), this motion is filed in Civil Action No. 2:19-cv-14758-JMV-JBC. However, the substance of this motion relates only to the Chambers Works action, Civil Action No. 1:19-14766-RMB-JBC.
[2] Plaintiffs interchangeably use the terms "restructuring transaction," "Restructuring plan," and "reorganization" to describe the 2019 reorganization and restructuring pursuant to which certain EID business lines (including its assets and liabilities) were transferred to DuPont Specialty Products USA, LLC ("DuPont Specialty Products"), which then became (and remained) a subsidiary of DuPont de Nemours, Inc. ("New DuPont"). (*See, e.g.*, SAC ¶¶ 9, 78, 186, 315.) Here, the relevant business lines included present and former plant operations, their associated operational liabilities located at a small Old DuPont leasehold at Chambers Works site, and the assignment of the leasehold itself).

compliance with ISRA was not triggered.[3] Further, Corteva and New DuPont seek dismissal of all ISRA allegations in the SAC related to the 2019 corporate reorganization because Plaintiffs' conclusory allegations are insufficient to state a claim against Corteva and New DuPont.

The second corporate reorganization, in 2019, included New DuPont's: (1) formation of a new indirect subsidiary, DuPont Specialty Products; (2) restructuring of selected businesses and assets among New DuPont's direct and indirect subsidiaries, such that certain assets and leaseholds at the Chambers Works Site were transferred from one New DuPont subsidiary (EID) to another New DuPont subsidiary (DuPont Specialty Products); and (3) the subsequent spin-off of Corteva, as well as Corteva's subsidiaries, including EID (the "2019 Reorganization"). After the 2019 Reorganization, New DuPont continued to indirectly own the assets and leaseholds at the Chambers Works site, through its

---

[3] Moving Defendants previously filed a Motion to Dismiss Count III of the Parlin Second Amended Complaint and, in Part, Count III of the Chambers Works Second Amended Complaint (i.e., the SAC.) (Dkt. 90.) Plaintiffs and Moving Defendants jointly filed a Proposed Order (Dkt. 165), voluntarily dismissing Count III of the Parlin Second Amended Complaint, which rendered the previously filed Motion to Dismiss moot insofar as it related to the Parlin site. Pursuant to Magistrate Clark's Letter Order (Dkt. 165), the previously filed Motion to Dismiss (Dkt. 90) was administratively terminated, and the Court directed Moving Defendants to file this updated motion, which is focused only on the remaining ISRA-related claim (i.e., that relating to the Chambers Works site). Moving Defendants intend to move for summary judgment on the remaining aspects of the Chambers Works ISRA claim (i.e., those relating to the 2015 corporate reorganization) after the completion of certain discovery.

subsidiary DuPont Specialty Products, and DuPont Specialty Products continued to perform environmental remediation at the Chambers Works leaseholds. DuPont Specialty Products is also a defendant in this litigation (although not a party to this Motion). (*See* SAC, ¶ 24.)

Plaintiffs' ISRA claim is moot insofar as it arises from the 2019 Reorganization because the relief sought in the SAC has already been provided. At the time of the 2019 Reorganization, out of an abundance of caution, DuPont Specialty Products: (1) filed a General Information Notice ("GIN"); (2) filed a Remediation Certification; and (3) established a Remediation Funding Source ("RFS") for the relevant leaseholds at the Chambers Works site. Plaintiffs failed to include these facts in their SAC, but the public filings were made with Plaintiff New Jersey Department of Environmental Protection ("NJDEP"). Thus, to the extent ISRA applied to the 2019 Reorganization at the Chambers Works site, it was satisfied.

Moreover, Plaintiffs' conclusory allegations that the 2019 Reorganization triggered ISRA are insufficient to state a claim against EID. Even taking as true the allegation that the Chambers Works leaseholds are "industrial establishment[s]" subject to ISRA (notwithstanding applicable exclusions in the ISRA definitions that require evidence beyond the pleadings), there is no legal foundation for the claim. First, there are clear ISRA exclusions for the remaining aspects of the 2019

Reorganization. NJDEP's own published rulemaking comments and formal interpretations in ISRA Letters of Non-Applicability ("LNAs") for similar transactions confirm that the 2019 Reorganization did not trigger a need to comply with ISRA for the Chambers Works site.[4] Nonetheless, Plaintiffs cherry-pick certain events that occurred during the reorganization transactions and allege, without any support, that those events required ISRA compliance. Because the alleged "triggers" were the types of transactions that either (a) are not subject to ISRA at all, or (b) are listed as widely accepted exclusions to ISRA, the ISRA claim arising from the 2019 Reorganization should be dismissed.

Lastly, Plaintiffs have not alleged any facts indicating that the two movant holding companies, Corteva and New DuPont, should be held liable for any violation of ISRA relating to the 2019 Reorganization. Although Corteva and New DuPont are named as defendants in the ISRA counts, Plaintiffs merely allege them to be liable because "[u]pon information and belief, Corteva and New DuPont assumed [EID's] ISRA liability." (*Id.* at ¶ 354.) Such conclusory claims, unsupported by factual allegations, do not meet the applicable pleading standards and, in any event, are derivative and should be dismissed on the same bases as the direct claims against EID.

---

[4] NJDEP developed a body of ISRA guidance known as LNAs pursuant to N.J.A.C. 7:26B-2.2(a-f) (withdrawn 2004), which opine about the applicability of ISRA to specific transactions, including corporate restructuring transactions.

## II.   <u>STATEMENT OF RELEVANT FACTUAL ALLEGATIONS</u>

Moving Defendants seek dismissal of the ISRA claim in Count III of the SAC arising from the 2019 Reorganization. (SAC, ¶¶ 352, 353.) Plaintiffs allege the following events or transactions related to the 2019 Reorganization:

- On January 29, 2019, EID transferred certain leaseholds at the Chambers Works site to its subsidiary, DuPont Specialty Products. (*See id.* at ¶¶ 71, 352.)

- At the time, both EID and DuPont Specialty Products were subsidiaries of New DuPont. (*See id.* at ¶¶ 217, 261, 268-271; *see also* Haworth Declaration ("Haworth Decl."), Ex. 1 (DuPont de Nemours, Inc. 2019 Form 10-K).)[5]

- Corteva was formed as holding company and a wholly owned subsidiary of New DuPont. (SAC, ¶¶ 265, 268-269.)

- On May 31, 2019, New DuPont contributed its equity ownership in EID to Corteva. (*Id.* at ¶ 277.)

- On June 1, 2019, EID transferred its equity ownership in DuPont Specialty Products to New DuPont. (*Id.* at ¶ 353.)

- Following that equity transfer, DuPont Specialty Products remained the holder of the leaseholds at the Chambers Works site and continues to hold those leaseholds today. (*Id.* at ¶ 352.)

---

[5] The SEC filings cited in Plaintiffs' SAC underlie their ISRA claim and, thus, are properly considered on this Motion. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] document integral to or explicitly relied upon in the complaint" may be considered "without converting the motion [to dismiss] into one for summary judgment."). Further, the Registration Statement is a publicly available SEC filing. Courts routinely take judicial notice of such SEC forms, which are available through EDGAR. *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000); *Love v. Alfacell Corp.*, No. 09-5199, 2011 U.S. Dist. LEXIS 119445, at *4-5 n.3 (D.N.J. Oct. 17, 2011).

Plaintiffs incorrectly allege that EID (or, derivatively, either or both of Corteva and/or New DuPont) should have complied with ISRA by filing a GIN with the NJDEP, calculating a remediation estimate, and establishing an RFS in connection with the following events or transactions:

- EID's conveyance of leaseholds for certain portions of the Chambers Works site from EID to DuPont Specialty Products on January 29, 2019 (*id.* at ¶ 352); and

- EID's transfer of ownership of DuPont Specialty Products, the owner of certain leaseholds at the Chambers Works site, to New DuPont on June 1, 2019 (*id.* at ¶ 353.)

Plaintiffs' SAC omits crucial facts in these allegations that render their ISRA claims related to the 2019 Reorganization moot. DuPont Specialty Products, the entity in possession of certain leaseholds at the Chambers Works Site, filed with NJDEP: (1) a GIN within five days of its equity ownership being transferred by EID to New DuPont on June 1, 2019; and (2) a Remediation Cost Review and RFS/FA Form ("Remediation Cost Review"); and (3) an RFS Self-Guaranty Application ("RFS Guaranty") establishing an RFS for the remediation of the Chambers Works leaseholds that are fully compliant with applicable ISRA rules.[6] (*See* Haworth Decl., Ex. 2 (GIN, DSP_CW00000415, 418) and Ex. 3 (Remediation Cost Review,

---

[6] Similar filings were made for the Parlin site, and the State has agreed to voluntarily dismiss the ISRA claim relating to that site. (*See* Consent Order, Dkt. 164, ¶ 3.)

DSP_CW00000560, 566; RFS Guaranty, *id.* at 573)).[7] Plaintiffs acknowledged the GIN was complete in a letter dated June 10, 2019. (*See* Haworth Decl., Ex. 4 (June 1, 2019 Letter from NJDEP to DuPont Specialty Products, DSP_CW00000991).)

To avoid any confusion, the GIN, Remediation Cost Review, and RFS Guaranty filed by DuPont Specialty Products in 2019 relate to the Chambers Works leaseholds held by DuPont Specialty Products, not the portions of the Chambers Works Site currently owned and operated by Defendant Chemours. (*See* Haworth Decl., Ex. 5 (Figure of DuPont Specialty Products Leaseholds).)

## III.   ARGUMENT

### A.   Standard of Review

A motion filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the facts alleged in the complaint, as viewed through the lens of Federal Rule of Civil Procedure 8(a). *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). The question is whether "the facts alleged in the complaint, even if true, fail to support" the plaintiff's claims. *Id.* (citation and quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 666 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

---

[7] These documents underlie the ISRA claim because Plaintiffs explicitly stated they were not filed. Thus, they may be considered now. *See Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

When considering a motion under Rule 12(b)(6), the Court must accept the plaintiff's well-pleaded facts and any reasonable inference that may be drawn from them. *See Mariotti v. Mariotti Bldg. Prods., Inc.*, 714 F.3d 761, 764-65 (3d Cir. 2013). But the Court need not credit Plaintiff's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citation omitted). Rule 8(a) "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, and, thus, "a formulaic recitation of the elements of a cause of action will not do," *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Here, Plaintiffs have not pleaded certain parts of Count III of the SAC (the ISRA Count) relating to the 2019 Reorganization in a legally sufficient manner, and amendment would be futile. Therefore, Count III should be dismissed with prejudice insofar as it relates to the 2019 Reorganization.

**B.**     **The Court should dismiss Plaintiffs' ISRA claim, relating to the 2019 Reorganization, because that aspect of the claim is moot.**

The thrust of Plaintiffs' ISRA claim, relating to the 2019 Reorganization, is that ISRA compliance is still needed for the leaseholds at the Chambers Works site. As relief, Plaintiffs primarily seek the filing of a GIN, Remediation Cost Review, and an RFS Guaranty establishing a corresponding RFS. However, all of those acts had been completed by the leasehold owner (DuPont Specialty Products) before the

8

SAC was filed. (Haworth Decl., Ex. 2, (GIN) and Ex. 3 (Remediation Cost Review and RFS Guaranty).) Thus, the relief sought by Plaintiffs had already been provided, and this aspect of their ISRA claim is moot.

Federal court jurisdiction extends only to actual "cases" and "controversies." U.S. CONST. art. III, § 2. "Generally speaking, a case becomes moot when the issues are no longer live or the parties lack a cognizable interest in the outcome." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698 (3d Cir. 1996). "Article III's 'case or controversy' requirement prevents federal courts from deciding cases that are moot. If developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit . . . the case must be dismissed as moot." *Id.* at 698-99 (citations omitted).

Plaintiffs seek an order compelling "[EID] . . . to fully comply with ISRA by, *inter alia*, the submission of a Remediation Certification and establishment of a [RFS] for the Chambers Works in conformance with N.J.A.C. 7:26C-5.1 to -5.13[.]" (SAC, Count III, Prayer for Relief (a).)[8] But those requests were moot long before the SAC was filed. On May 31, 2019, **over a year before the SAC was filed**, as the

---

[8] Plaintiffs also seek "reasonable costs of preparing and litigating [NJDEP's] claim seeking the enforcement of EID's ISRA obligations." (SAC, Count III, Prayer for Relief (b).) Because the substantive relief requested in SAC, Count III, Prayer for Relief (a) is moot, and because the relief sought had already been provided before Plaintiffs filed the SAC, Plaintiffs are not entitled to the relief sought in SAC, Count III, Prayer for Relief (b).

2019 Reorganization was coming to fruition, DuPont Specialty Products submitted a GIN, which NJDEP recorded as received on June 3, 2019. (Haworth Decl., Ex. 2 (GIN).) Shortly thereafter, DuPont Specialty Products also took each of the other actions that Plaintiffs now demand, including the filing of a Remediation Cost Review and the posting of an RFS Guaranty. (Haworth Decl., Ex. 3 (Remediation Cost Review and RFS Guaranty).)

The Remediation Cost Review filed with NJDEP calculates the "estimated cost to complete remediation" of the Chambers Works leaseholds at $250,000 (Haworth Decl., Ex. 3 (Remediation Cost Review).) That Remediation Cost Review was prepared and certified by an authorized third-party New Jersey Licensed Site Remediation Professional ("LSRP"). An RFS Guaranty consistent with NJDEP regulations was then submitted to NJDEP, and an RFS was established in the amount that the LSRP calculated. When the RFS Guaranty was submitted in September 2019, it was backed by a "Self-Guaranty," which was the guaranty of DuPont Specialty Products' parent company, New DuPont (as permitted by N.J.A.C. 7:26B-5.8(b)). The forms listed the guarantor's net worth at $94,571,000,000 and the guarantor's annual Net Cash Provided By Operating Activities at $4,731,000,000. (Haworth Decl., Ex. 3, (RFS Guaranty).) On January 27, 2021, in apparent response to the Moving Defendants' prior Motion to Dismiss (Dkt. 90), NJDEP wrote to DuPont Specialty Products and stated that neither DuPont Specialty Products nor

New DuPont could rely on the Self-Guaranty, and would instead need to implement an alternative RFS mechanism. (Haworth Decl., Ex. 6 (Email Chain between NJDEP and DuPont Specialty Products, DSP_CW00001001).) DuPont Specialty Products immediately procured and filed with NJDEP a surety bond to cure the alleged RFS deficiency. (Haworth Decl., Ex. 7 (NJDEP Confirmation of Surety Bond (DSP_CW00001008).)

The relief sought in Count III, insofar as that Count relates to the 2019 Reorganization, was satisfied long ago. "Once a party has received the relief sought, his claim becomes moot and this Court loses subject matter jurisdiction because no case or controversy remains." *Horner v. ELM Locating & Util. Servs.*, No. 13-1168, 2014 U.S. Dist. LEXIS 174237, at *2 (C.D. Ill. Nov. 18, 2014); *see also Blanciak*, 77 F.3d at 698-99. No case or controversy remains before this Court with respect to the ISRA claim related to the 2019 Reorganization. Thus, that claim should be dismissed with prejudice.

C. **The events of the 2019 Reorganization did not trigger the need to comply with ISRA because, as a matter of law, they fall under three separate statutory exclusions.**

Moreover, the Court should dismiss the ISRA claim insofar as it relates to the 2019 Reorganization because that transaction falls under three separate ISRA exclusions. Plaintiffs allege that EID "engag[ed] in a series of complex restructuring transactions," including "the transfer of EID's historic assets to other entities,

11

including [New] DuPont . . . ." (SAC, ¶ 11.) Plaintiffs then detail two discrete events relating to the 2019 Reorganization that they claim required ISRA compliance.

One of these steps is alleged to have occurred on January 29, 2019, when EID allegedly transferred a leasehold interest for a portion of the Chambers Works site to DuPont Specialty Products. (*Id.* at ¶¶ 71, 352.) The second alleged step was the May 30, 2019 transfer of EID's membership interest in DuPont Specialty Products to EID's then-parent, New DuPont. (*Id.* at ¶ 353.) Whether evaluated as a single corporate reorganization transaction or as separate transactions, these two events did not trigger the need to comply with ISRA.

The 2019 Reorganization and its component steps fell under at least three ISRA exclusions: (1) the corporate reorganization exclusion (*see* N.J.A.C. 7:26B-2.1(a)(1) and N.J.S.A. 13:1K-8 (exclusion 1 to "change in ownership" definition)); (2) the common ownership exclusion (N.J.A.C. 7:26B-2.1(a)(2) and N.J.S.A. 13:1K-8 (exclusion 2 to "change in ownership" definition)); and (3) the indirect owner exclusion (N.J.A.C. 7:26B-2.1(a)(4) and N.J.S.A. 13:1K-8 (exclusion 3 to "change in ownership" definition)). Those exclusions, along with a general overview of ISRA, are set forth below.

12

1.   <u>ISRA structure and analysis</u>

ISRA does not apply to all transfers of ownership or operation of real property and other assets.[9] Two key definitions are used to define transactions and events involving "industrial establishments" that are – or are not – subject to ISRA. The key definition in ISRA is the defined phrase "transferring ownership or operations," which incorporates within its definition a smaller subset of "change of ownership" transactions. *See* N.J.A.C. 7:26B -1.4; N.J.S.A. 13:1K-8. ISRA also uses those two defined phrases within its definition of the phrase "change in ownership," which describes those transactions that generally are considered a "change in ownership" and lists eleven types of transactions that this definition "shall not include." *See* N.J.S.A. 13:1K-8. The ISRA regulations contain a corresponding subchapter titled "Applicability," and N.J.A.C. 7:26B-2.1, which is the very first "applicability" regulation, is titled "Operations and transactions not subject to ISRA." That section expressly enumerates twenty-two such "[o]perations and transactions not subject to ISRA." N.J.A.C. 7:26B-2.1 (stating that "[t]he following transactions shall not be considered closing operations or transferring of operations or ownership . . . ."). Because ISRA only applies to closures of operations or changes of ownership that

---

[9] For example, intra-family real estate transfers, corrective deeds, easements, condemnations, mortgages, lease renewals, intestate successions, transfers pursuant to a trust, releases of a reversionary interest, and sales of residential property are excluded from ISRA obligations. *See* N.J.A.C. 7:26B-2.1(a).

fall within the definitions, all excluded transactions and events that are listed in N.J.A.C. 7:26B-2.1(a) and N.J.S.A. 13:1K-8's list of events and transactions that "shall not" be included in the definition of "Change in ownership" fall outside the purview of ISRA.[10]

For a particular event involving an "industrial establishment" to trigger ISRA, that event must meet two criteria; it must (1) be one of the initial events enumerated in the ISRA statute or regulations as a "transfer of ownership or operations," and (2) not constitute one (or more) of the thirty-three events that are expressly excluded. Despite pleading the nature and steps of the transactions, Plaintiffs do not acknowledge that the events at issue are the very types of events that Plaintiff NJDEP (and the Legislature) decided are excluded from ISRA.

> 2. The 2019 Reorganization events were not subject to ISRA because the corporate reorganization exclusion applies.

ISRA expressly provides that a "corporate reorganization not substantially affecting the ownership or control of the industrial establishment" is a transaction *not* subject to ISRA. N.J.A.C. 7:26B-2.1(a)(1). "Corporate reorganizations" include "restructuring or reincorporation by the management or owners of an entity, which does not diminish the availability of assets for any remediation, diminish NJDEP's

---

[10] The second subpart of the "Applicability" regulation expressly lists a series of exclusions to the broader definition of "industrial establishments" that might otherwise be subject to ISRA. N.J.A.C. 7:26B-2.1(b). For purposes of this motion only, Moving Defendants accept as true, as they must, the allegation that the Chambers Works site is an "industrial establishment," as alleged in the SAC.

ability to reach those assets, or otherwise hinder the owner's or operator's ability to remediate the industrial establishment." N.J.A.C. 7:26B-1.4.

"Restructuring" and "assets" are undefined terms in the statute and regulations, and are afforded their ordinary meaning under N.J. law. *See* N.J.S.A. 1:1-1 ("In the construction of [N.J. civil statutes] words and phrases shall be read and construed with their context, and shall . . . be given their generally accepted meaning, according to the approved usage of language."). Thus, "asset" means "the entries on a balance sheet showing the items of property owned, including cash, inventory, equipment, *real estate*, accounts receivable, and goodwill" (emphasis added)) and "restructuring" means "[a] fundamental and sometimes drastic change that will alter the relationships within a company or with other companies," which is completely consistent with the 2019 Reorganization, a transaction that encompassed multiple steps. *See* Asset and Restructuring, BLACK'S LAW DICTIONARY (10th ed. 2014).

NJDEP has explained to the public in its own ISRA guidance documents that the corporate reorganization exclusion involves two basic elements: (1) the transaction must be between "Persons," as defined at N.J.A.C. 7:26B-1.4, under common ownership; and (2) the financial ability of the owner or operator of the industrial establishment to remediate the site cannot be significantly diminished as a result of the transaction. (*See* Haworth Decl., Ex. 8 (NJDEP, *Site Remediation*

*Following the Industrial Site Recovery Act (ISRA)*, https://www.nj.gov/dep/srp/isra/isra_applicability.htm ("Corporate Reorganization Transactions")).)[11] The "four factors" that NJDEP suggests are to be considered are: (1) the identity of each direct and indirect owner of the Industrial Establishment and the organizational structure before and after the transaction; (2) whether the transaction involves the transfer of stock and/or assets solely among persons under common ownership or control and/or shareholders or owners of such persons; (3) whether the transaction will result in an aggregate diminution of more than 10 percent in the net worth of the Industrial Establishment or of the person directly owning or operating the Industrial Establishment, *or* whether there is an equal or greater amount in assets that is "available for the remediation of the industrial establishment" before and after the transaction; and (4) any additional information which may be relevant to the determination. (*Id.*)

EID's January 29, 2019 transfer of leaseholds at the Chambers Works site to DuPont Specialty Products, realignment of assets (as described in the SAC), and the ensuing June 1, 2019 transfer of ownership of DuPont Specialty Products and contemporaneous spin-off of Corteva satisfied all of the above factors. Plaintiffs recognize that DuPont Specialty Products and EID were subsidiaries of New DuPont

---

[11] Courts regularly take judicial notice of such agency guidance materials. *See Sierra Club v. U.S. EPA*, 762 F.3d 971, 975 n.1 (9th Cir. 2014) (taking judicial notice of EPA's "public guidance").

as of the June 1, 2019 membership interest transfer and, as such, that it was a "transfer of stock, assets or both, among corporations under common ownership." (SAC, ¶ 2; *see also id.* at ¶¶ 217, 218, 220, 261, 264, 266, 268-272.)

Moreover, the financial ability of the owner to remediate the leaseholds at issue was not significantly diminished. The transfer of the Site from one multi-billion dollar corporation (EID) to another (DuPont Specialty Products) did not diminish the assets available for remediation. In fact, Plaintiffs allege that the new owner of the Chambers Works leaseholds, DuPont Specialty Products, has ***more*** assets available for remediation of the site than EID did. (*See id.* at ¶¶ 219, 222, 289.) This is consistent with the 2019 Remediation Cost Review and RFS Guaranty filed with NJDEP for the Chambers Works Site, demonstrating that DuPont Specialty Products, as a subsidiary of New DuPont, had over $94B in net worth (*see* Haworth Decl., Ex. 3 (Remediation Cost Review, RFS Guaranty)), as opposed to $41B prior to the 2019 Reorganization, when the leasehold was owned and operated by EID. (*See id.* at ¶ 287.)

ISRA and the regulations promulgated thereunder use the terms "assets" and "net worth" when addressing assets available for remediation. NJDEP's own guidance materials explain how the public should evaluate ISRA non-applicability, and at least twice instruct those analyzing ISRA to consider "net worth" and to "consult . . . (1) Income and expenses or similar statements . . .; and (2) Audited

balance sheets or similar statements of assets and liabilities . . . ." (Haworth Decl.,

Ex. 8 (NJDEP "Corporate Reorganization Transactions" Guidance).)

As to the four "factors" considered in evaluating the transaction, they show

the applicability of the ISRA exclusion. First, the "direct owner" of the Chambers

Works leaseholds changed from EID to DuPont Specialty Products. The "indirect

owner" – i.e., New DuPont and its shareholders – stayed the same. Second, EID and

DuPont Specialty Products were under the common ownership of New DuPont. And

as to the third and fourth factors, according to the SAC and to the actually posted

RFS, more assets were for remediation after the leasehold transfer.[12] (*See* SAC,

¶ 289 (alleging that EID had "nearly $41 billion in tangible assets" before the

corporate reorganizations and $43.251 billion assets as of September 2019 "just after

the Corteva spinoff," which was the last step in the DowDuPont 2019

Reorganization); *see also id.* at ¶¶ 219 222.) Moreover, the new "Direct Owner,"

DuPont Specialty Products, presented financials to NJDEP with its Remediation

Cost Review and RFS Guaranty for the site remediation costs that reflect over $94

billion in its own net worth, to fund the approximately $250,000 in estimated

remediation costs – far more than the $43 billion the SAC references EID had in

---

[12] NJDEP regulations permit parent corporations, like New DuPont, to provide a self-guarantee "for a wholly owned subsidiary that is the person responsible for conducting the remediation when the wholly owned subsidiary does not have its own audited financial statements and its financial statements are reported through that parent company." N.J.A.C. 7:26C-5.8(b).

assets after the 2019 Reorganization. (SAC, ¶ 289; Haworth Decl., Ex. 3 (Remediation Cost Review and RFS Guaranty).)

Notably, there are no reported cases illustrating the application of ISRA's corporate reorganization exclusion in this context. However, NJDEP has offered guidance in the form of administrative decisions, in LNAs. Prior to 2008, when NJDEP discontinued the LNA procedure, NJDEP permitted entities that were considering corporate transactions potentially subject to ISRA – like EID, which obtained numerous LNAs on numerous past transactions involving sites at issue in this litigation – to seek a formal NJDEP ruling on whether ISRA would apply to a particular transaction or series of transactions. (*See* Haworth Decl., Ex. 9 (N.J.A.C. 7:26B-2.2(a-f) (withdrawn)).) If NJDEP agreed that ISRA was inapplicable to a given transaction, then it would issue a LNA. (*Id.*)

Through such LNAs, NJDEP established precedent that corporate reorganizations identical or nearly identical to the 2019 Reorganization are excluded from ISRA's scope, and do not require ISRA compliance. One of the many such transactions – the ConocoPhillips restructuring – received NJDEP approval in 2012 and involved a spin-off transaction structurally identical to the 2019 Reorganization.

The 2012 ConocoPhillips restructuring transaction (the "Conoco Restructuring") was approved by NJDEP based on the corporate reorganization exclusion discussed here, as well as the common ownership and indirect ownership

exclusions discussed in subsequent sections of this motion (*See* Haworth Decl., Ex. 10 (Conoco Application for an LNA and LNA issued to Conoco ("Conoco Submission")).)[13] The 2019 Reorganization described in the SAC was structurally identical to the 2012 Conoco Restructuring: both involved the creation and spin-off of new publicly-traded holding companies, which at the time of the spin-off held some of the original company's assets. Both involved a series of corporate events or steps whereby various operating assets, including real estate, were transferred among commonly owned subsidiaries of large corporations; SEC filings were made to permit the publicly trading and spinoff of certain subsidiaries; and then the stock of these new corporations was later distributed to shareholders of the original parent company.

Here, Plaintiffs allege that EID transferred leaseholds at the Chambers Works site to DuPont Specialty Products, a wholly owned subsidiary, in 2019. This was followed by the transfer of ownership of DuPont Specialty Products to another member of the corporate family, New DuPont. In the final steps, EID's stock allegedly was transferred to Corteva, and Corteva's stock was distributed to EID's

---

[13] The court may take judicial notice of records and reports of administrative bodies, such as requests for and copies of LNAs. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 274 (D.N.J. 2007) (taking judicial notice of SEC no-action letter); *see also Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("Courts have defined a public record, for purposes of what properly may be considered on a motion to dismiss, to include . . . letter decisions of government agencies . . . and published reports of administrative bodies.").

shareholders, making Corteva a separate, publicly traded company. (*See* SAC, ¶¶ 277-279.)

In the Conoco Restructuring, Conoco similarly decided to separate into two publicly traded companies. Conoco's real estate and operating assets were owned by a subsidiary called "COPCo," which owned "upstream" and "downstream" petroleum assets. In one reorganization step, Conoco created a new subsidiary, Phillips 66 ("P66"), as a corporate sister for COPCo, which was later separated as a new publicly traded company. (*See* Haworth Decl., Ex. 10 (Conoco Submission at 1-2).) In the 2019 Reorganization, the functionally equivalent step involved the creation of Corteva, which was later spun off.

In another step, Conoco transferred COPCo's "downstream" refineries, marketing operations, and related business units (including the real property for several New Jersey industrial establishments) into a new COPCo subsidiary, called "Phillips 66 Company." (*See* Haworth Decl., Ex. 10 (Conoco Submission at 1-2).) That step was functionally identical to the 2019 transfer of various EID assets including operations and its Chambers Work leaseholds to a new subsidiary, DuPont Specialty Products. (SAC, at ¶ 315.)

Next, Conoco distributed the stock of Phillips 66 Company (which by then owned the "downstream" refinery, tanks farms pipelines, etc.) to P66. (*See* Haworth Decl., Ex. 10 (Conoco Submission at 2).) In the 2019 Reorganization, the equivalent

step involved transferring ownership of DuPont Specialty Products to New DuPont, and transferring EID's ownership to Corteva. (SAC, ¶ 277.)

Finally, Conoco's ownership in its wholly-owned P66 subsidiary (which by then owned Phillips 66 Company) was transferred to the shareholders of Conoco, and P66 became a separate, publicly traded corporation owned by the same shareholders as Conoco. (*See* Haworth Decl., Ex. 10 (Conoco Submission at 2).) In the 2019 Reorganization, the equivalent step was the transfer of Corteva shares to New DuPont's shareholders, such that Corteva became a separate, publicly traded corporation owned by the same shareholders as New DuPont. (SAC, ¶¶ 277-279). New DuPont's subsidiary, DuPont Specialty Products, retained the Chambers Works leaseholds and liabilities. (*Id.* at ¶¶ 268-269.)

Both the Conoco Reorganization (which is but one of many similar transactions) and the 2019 Reorganization met all of basic elements of ISRA's corporate reorganization exclusion. Thus, the corporate reorganization exclusion applies, and ISRA compliance was not triggered by the 2019 Reorganization.

3.    The 2019 Reorganization events were not subject to ISRA because they fall under the common ownership exclusion.

The "common ownership exclusion" also applies to all three steps of the 2019 Reorganization. That exclusion appears in N.J.A.C. 7:26B-2.1(a)(2), and provides, in pertinent part, that the following type of transaction "shall not be considered closing operations or transferring of operations or ownership":

22

A transaction or series of transactions involving the transfer of stock and/or assets among corporations under common ownership if the transaction or transactions will not result in:

i. The diminution of the net worth of the corporation that directly owns or operates the industrial establishment by more than 10 percent; or

ii. A greater or equal amount of assets are available for the remediation of the industrial establishment before and after the transaction or transactions[.]

N.J.A.C. 7:26B-2.1(a)(2). These "common ownership" and financial asset viability factors are essentially the same as those analyzed above with respect to corporate reorganization exclusion. During all of the reorganization steps identified in the SAC, the assets and stock at issue were transferred among entities that were each subject to common ownership: i.e., the entities were held by New DuPont. Further, the amount of assets available for remediation before and after the transaction did not diminish (and in fact, increased), as demonstrated by Plaintiffs' allegations and the June 2019 ISRA filings discussed above. (SAC, ¶¶ 195, 213). Accordingly, the exclusion applies. This exclusion was also accepted as applicable by NJDEP in the Conoco Restructuring. (Haworth Decl., Ex. 10 (Conoco Submission).)

4.      The 2019 Reorganization events were not subject to ISRA because they fall under the indirect owner exclusion.

The indirect owner exclusion provides, in pertinent part, that the following transaction type "shall not be considered closing operations or transferring of operations or ownership":

> A transaction or series of transactions involving the transfer of stock and/or assets resulting in a change in the person holding the controlling interest of an indirect owner of an Industrial Establishment, when the indirect owner's assets would have been unavailable for remediation if the transaction or transactions had not occurred.

N.J.A.C. 7:26B-2.1(a)(4); s*ee also* N.J.S.A. 13:1K-8 ("change in ownership").

Per N.J.A.C. 7:26B-1.4 ("Definitions"), "'Indirect owner' means any person who holds a controlling interest in a direct owner or operator, holds a controlling interest in another indirect owner, or holds an interest in a partnership which is the indirect owner or a direct owner or operator, of an industrial establishment."

DEP's former LNA regulation, N.J.A.C. 7:26B-2.2(b) (withdrawn), established the standards for the application of this exclusion and was often cited in LNAs issued with respect to corporate reorganizations. Those standards are now set forth on NJDEP guidance webpage, titled "How To Determine If ISRA Applies to You." (Haworth Decl., Ex. 8.) The focus is to "determine whether the indirect owner has exercised control over the industrial establishment or its direct owner or operator." Six factors should be considered. "No one factor is determinative. All factors in their totality must be must considered." (*Id*.) Per NJDEP's guidance, the owner of the industrial establishment should: identify each direct owner and each indirect owner of the industrial establishment; identify whether the indirect owner exercised fiscal control over the direct owner of the industrial establishment; evaluate whether management of the indirect owner are a majority of the directors

of the direct owner; evaluate whether management of the indirect owner is involved in the day-to-day operations of the direct owner, particularly as to hazardous substances; determine whether the indirect owner has the ability to control the activities, policies or decisions of the direct owner of the industrial establishment, particularly as to hazardous substances; and (new in the current website guidance) evaluate any additional information which may be relevant to this determination. (*Id.*)

The indirect owner transactions inquiry focuses on whether the indirect owner's assets would have been available for remediation of the industrial establishment if the transaction did not occur. New DuPont and its shareholders were the indirect owners of the Chambers Works leaseholds before and after the cited 2019 transactions. Plaintiffs allege that the Dow and Old DuPont merger was specifically structured so that Dow and New DuPont were not "infected" with Old DuPont's liabilities. (SAC, ¶¶ 262, 278, 353.) So, from Plaintiffs' own pleading, it is evident that even Plaintiffs contend that New DuPont's assets were not available for remediation before or after the 2019 transactions occurred. The same holds true for New DuPont's public shareholders, and nothing is pleaded to the contrary.

There is no substantive allegation that the indirect owners of Old DuPont during these transactions were liable for remediation costs.[14] Similarly, nothing is pleaded that suggests that the indirect owners were involved in or controlled the day-to-day operations of the direct owner, particularly as to hazardous substances, or that they had the ability to control Old DuPont's activities.[15] This exclusion and analysis thereof was also accepted by NJDEP as applicable in the Conoco restructuring transaction. (*See* Haworth Decl., Ex. 10, Conoco Approval Letter.)

> **D.** **Plaintiffs did not sufficiently plead that Corteva or New DuPont assumed EID's liability because Plaintiffs legal assertions are not supported by facts.**

Plaintiffs have not alleged any facts indicating that Corteva and New DuPont should be held liable for any violation of ISRA relating to the 2019 Reorganization. Although Corteva and New DuPont are named as defendants in the ISRA counts, Plaintiffs merely allege them to be liable because "[u]pon information and belief,

---

[14] Except, of course, for the "bald assertion" and conclusory allegation that Corteva and New DuPont accepted Old DuPont's ISRA liabilities, which is not entitled to any inference of truth. *See Morse*, 132 F.3d at 906.

[15] NJDEP rejected any interpretation of N.J.A.C. 7:26B-2.2(b) that would hold a parent liable for ordinary oversight of a subsidiary. 29 N.J.R. 4913(a) at 4925 (final rule promulgating N.J.A.C. 7:26B-2.2(b), which addresses comments on the rule and states the rule "does not unnecessarily expand the potential liability of indirect owners of industrial establishments…a corporation enjoys limited liability and a parent would not be liable for the actions of a subsidiary unless the corporate veil of the subsidiary can be pierced"); *N.J. Dep't of Envtl. Prot. v. Ventron*, 94 N.J. 473, 502 (1983). NJDEP agreed in writing with Conoco's legal analysis, which is identical to Old DuPont's. (Haworth Decl., Ex. 10.)

Corteva and New DuPont assumed EID's ISRA liability." (SAC, ¶ 354.) Conclusory claims, unsupported by factual allegations, do not meet the applicable pleading standards and, in any event, are derivative and should be dismissed on the same bases as the direct claims against EID.

The Court need not credit Plaintiffs' "bald assertions" or "legal conclusions." *Morse*, 132 F.3d at 906 (citation omitted). Rule 8(a) "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation," *Iqbal*, 556 U.S. at 678, and, thus, "a formulaic recitation of the elements of a cause of action will not do," *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Because Plaintiffs have failed to allege any facts indicating that Corteva and New DuPont assumed EID's ISRA liability, all ISRA allegations in the SAC related to the 2019 Reorganization against Corteva and New DuPont should be dismissed.

## IV. <u>CONCLUSION</u>

Count III of the SAC, insofar as it is related to the 2019 Reorganization, is moot because Plaintiffs have already received the substantive relief associated with that claim. Moreover, even if not moot, that aspect of Count III should be dismissed because Plaintiffs have failed to set forth sufficient factual allegations to support their claim that the alleged ISRA claims relating to the 2019 Reorganization were

subject to ISRA. Merely stating the legal conclusion that the alleged ISRA triggers "constituted a 'change in ownership' and a 'transfer of ownership or operations' as defined in ISRA" does not make it true. In fact, as demonstrated above, Plaintiffs ignore the myriad exclusions within ISRA and the associated regulations, several of which apply to the alleged ISRA triggers.

For all of the foregoing reasons, Count III, insofar as it is related to the 2019 Reorganization, should be dismissed with prejudice.

Respectfully submitted,

Date: November 24, 2021

s/ *David A. Haworth*
**BALLARD SPAHR LLP**
A Pennsylvania Limited Liability Partnership
David A. Haworth, Esq.
*haworthd@ballardspahr.com*
Justin Lamson, Esq. (admitted *pro hac vice*)
*lamsonjw@ballardspahr.com*
Justin Kerner, Esq.
*kernerj@ballardspahr.com*
Erin M. Carter, Esq. (admitted *pro hac vice*)
*cartere@ballardspahr.com*
700 East Lake Drive, Suite 330
Mount Laurel, NJ 08054-0015
T: 856.761.3400
F: 856.761.1020
*Counsel for Defendant E. I. du Pont de Nemours and Company (as to Third Count only in Civil Action Nos. 1:19 -14766 and 3:19 -14767, the ISRA claims); Corteva, Inc. (as to all claims except the fraudulent transfer claims); and DuPont de Nemours, Inc. (as to all claims except the fraudulent transfer claims)*

28